# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| DENISE PARKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE DECEDENT, AUSTIN PARKER, FOR AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES AND AS ADMINISTRATRIX OF THE ESTATE OF AUSTIN PARKER | PLAINTIFF |
| v. | CIVIL ACTION NO: 3:25-cv-139-KHJ-ASH |
| KEMPER COUNTY, MISSISSIPPI; SHERIFF JAMES MOORE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS SHERIFF OF KEMPER COUNTY, MISSISSIPPI; SERGEANT JONATHAN LUDGOOD, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; LIEUTENANT CORDERO BOBO, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; CORRECTIONAL OFFICER SHANTEKA NEEDOM, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY; CORRECTIONAL OFFICER SOPHIA DUNBAR INDIVIDUALLY AND IN HER OFFICIAL CAPACITY; CAPTAIN RASHENIA HILL, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY; WARDEN MARQUICE COLLINS, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; and JOHN and JANE DOES 1-25 | DEFENDANTS |

## COMPLAINT
### Jury Trial Demanded

COMES NOW Plaintiff, Denise Parker, individually and as a personal representative of the decedent, Austin Parker, for and on behalf of all wrongful death beneficiaries, and as Administratrix of the Estate of Austin Parker, and complains as follows:

## PARTIES

1.      Plaintiff, Denise Parker, ("Ms. Parker," "Plaintiff Parker," or "Plaintiff") is an adult, female resident of Meridian, Mississippi. Ms. Parker resides at 4728 East Crescent Lake Drive, Meridian, MS 39301. Ms. Parker is the mother of Austin Parker and brings this action individually, as personal representative of Austin Parker, and as a wrongful death beneficiary of Austin Parker, deceased, on behalf of all wrongful death beneficiaries of Austin Parker, and on behalf of the Estate of Austin Parker as Administratrix thereof. For purposes of clarity and brevity, Ms. Parker will be listed herein as one person though she represents herself, all wrongful death beneficiaries, and the Estate.

2.      Defendant Kemper County, Mississippi, is a political subdivision of the State of Mississippi and may be served with process by service upon its Chancery Clerk, Shirlene Watkins, 280 Veterans Street, DeKalb, Mississippi 39328.

3.      Defendant Sheriff JAMES MOORE ("Sheriff Moore" or "Defendant Moore") is the duly elected Sheriff of Kemper County, Mississippi and can be served with process at 330 Stennis Industrial Park Road, De Kalb, Mississippi 39328. At all material times, Defendant Moore was the Sheriff of Kemper County, Mississippi, vested with the responsibility and authority to hire, train, and supervise employees, and to set, adopt, implement, and enforce policies and procedures at the Kemper-Neshoba Regional Correctional Facility ("KNRCF") and to provide protection to the citizens of Kemper County, Mississippi, and the state of Mississippi, including Austin Parker. Defendant Moore is sued in his official and individual capacities. Defendant Moore, at times material hereto, was acting under color of state law in his official capacity as the Sheriff of Kemper County, Mississippi, and the actions of Defendant Moore were done and performed under the color and pretense of the ordinances, regulations, policies, customs, and usages of Kemper County, Mississippi.

2

4. Defendant JOHNATHAN LUDGOOD, ("Sergeant Ludgood") or ("Defendant Ludgood"), is sued in his official and individual capacities as an employee of the Kemper County Sheriff's Department. Defendant Ludgood can be served with process at 374 Stennis Industrial Park Road, De Kalb, Mississippi 39328, or wherever he may be found. At all times relevant to this Complaint, Defendant Ludgood acted under color of law and within the scope of his employment.

5. Defendant CORDERO BOBO, ("Lieutenant Bobo" or "Defendant Bobo"), is sued in his official and individual capacities as an employee of the Kemper County Sheriff's Department. Defendant Bobo can be served with process at 374 Stennis Industrial Park Road, De Kalb, Mississippi 39328, or wherever he may be found. At all times relevant to this Complaint, Defendant Bobo acted under color of law and within the scope of his employment.

6. Defendant SHANTEKA NEEDOM, ("Officer Needom" or "Defendant Needom"), is sued in her official and individual capacities as an employee of the Kemper County Sheriff's Department. Defendant Needom can be served with process at 374 Stennis Industrial Park Road, De Kalb, Mississippi 39328, or wherever she may be found. At all times relevant to this Complaint, Defendant Needom acted under color of law and within the scope of her employment.

7. Defendant SOPHIA DUNBAR, ("Officer Dunbar" or "Defendant Dunbar"), is sued in her official and individual capacities as an employee of the Kemper County Sheriff's Department. Defendant Dunbar can be served with process at 374 Stennis Industrial Park Road, De Kalb, Mississippi 39328, or wherever she may be found. At all times relevant to this Complaint, Defendant Dunbar acted under color of law and within the scope of her employment.

8. Defendant RASHENIA HILL, ("Captain Hill" or "Defendant Hill") is sued in her

official and individual capacities as an employee of the Kemper County Sheriff's Department. Defendant Hill can be served with process at 374 Stennis Industrial Park Road, De Kalb, Mississippi 39328, or wherever she may be found. At all times relevant to this Complaint, Defendant Hill acted under color of law and within the scope of her employment.

9.     Defendant MARQUICE COLLINS ("Warden Collins" or "Defendant Collins") is sued in both his individual capacity and in his official capacity as an employee of the Kemper County Sheriff's Department and Warden of KNRCF. Collins can be served with process at 374 Stennis Industrial Park Road, De Kalb, Mississippi 39328, or wherever he may be found. Defendant Collins, at all times material hereto, was vested with the responsibility and authority to hire, train, supervise, set, adopt, implement, and enforce policies and procedures at KNRCF, was acting under color of state law in his official capacity as an officer with the Kemper County Sheriff's Department and Warden of KNRCF. The actions of Defendant Collins were done and performed under the color and pretense of the ordinances, regulations, policies, customs, and usages of Kemper County, Mississippi and the State of Mississippi.

10.     Defendants John Does 1-25 are unknown individuals and/or entities liable to Plaintiff for the acts and omissions as alleged herein. The names and capacities of Defendants John Does 1-25 inclusive, whether individual, corporate or otherwise, are presently unknown to Plaintiff, who therefore sues said Defendants by fictitious names and will further seek leave of this Honorable Court to amend this Complaint to show their true names and capacities when the same are ascertained. Plaintiff alleges upon information and belief each of the Defendants designated herein as a Doe is responsible in some manner and liable herein to Plaintiff by reason of negligence, wanton and reckless misconduct, deprivation of civil rights, and/or in some other manner whether alleged herein in this Complaint or not, and by such wrongful conduct, said Defendants, each of them, proximately caused the injuries, deprivations, and damages occasioned herein.

10. To the extent their identities are known, it is believed that all aforementioned parties reside in the State of Mississippi.

**JURISDICTION**

12. This Court has jurisdiction pursuant to 28 U.S.C. §1331 as this action arises under the laws of the United States, specifically 42 U.S.C. §1983 and the Eighth and Fourteenth Amendment of the United States Constitution.

13. Venue is proper in the Northern Division of the Southern District of Mississippi pursuant to 28 U.S.C. §139l(b) as one or more defendants reside in Kemper County and a substantial part of the events or omissions giving rise to the claim occurred in Kemper County.

**FACTS**

14. Austin Parker was a resident of Newton, Mississippi. He was a beloved son and brother, and was a genuine, kind, and loving human being. Austin worked as a deckhand on a river boat and had a bright future ahead of him. At the time of his death, Austin was twenty-six years old.

15. On or around January 22, 2023, Austin was arrested by officers of the Meridian Police Department ("MPD"), after being pulled over for running a red light in Meridian, Mississippi. The officers discovered that Austin had an active warrant dated March 1, 2021 for a misdemeanor contempt of court charge. Austin was transported by two MPD officers to the Meridian Police Department, then transported to the Kemper-Neshoba Regional Correctional Facility ("KNRCF").

16. Austin arrived at KNRCF at approximately 2:40 a.m. on January 22, 2023. Once there, Defendant Ludgood, Defendant Bobo, and Defendant Dunbar completed Austin's KNRCF

booking process. The three officers interacted with Austin for several minutes and did not make any written notation of behavior out of the ordinary. (Exhibits 1, 2, and 3)

17. After being booked, Austin was escorted to "County Dorm 4" in KNRCF. County Dorm 4 is a housing unit with 24-hour video surveillance.

18. County Dorm 4 is not a direct observation unit. Instead, it is outfitted with a video surveillance system to allow observation of the detainees housed inside. Officers in the KNRCF central control room are then able to observe and supervise the detainees using this system.

19. During Austin's detention in County Dorm 4, Defendant Ludgood, Defendant Bobo, Defendant Needom, and Defendant Dunbar were in Central Control and had the ability to constantly monitor the individuals in Dorm 4 via the jail's video surveillance system.

20. The video recording of Austin's time in County Dorm 4 is attached hereto as Exhibit 4. Austin enters County Dorm 4 at the 2:08 mark of Exhibit 4.

21. Once inside County Dorm 4, Austin admitted to other people housed there that he had ingested methamphetamine prior to arriving at KNRCF. John Dampeer was housed in County Dorm 4 with Austin and told one of the other detainees that Austin swallowed "ice" (methamphetamine). Charles Bozeman, another person housed in County Dorm 4, confirms that Austin began acting "funny" and that Austin told Bozeman that Austin swallowed "ice" when he was getting pulled over by MPD.

22. Austin began to show clear and obvious signs of physical distress while in County Dorm 4. In an attempt to get off of his top bunk, Austin fell to the floor of the dorm (Ex. 4 at 58:04).

23. Austin's distress soon became obvious to others housed in County Dorm 4. Austin's stumbling and inability to control his erratic movements prompted an inmate to get out of bed and offer assistance to Austin (Ex. 4 at 59:40).

24. Austin then walked over to a table and sat on a stool where his legs constantly jerked until finally he stood back up and stumbled erratically before taking a seat at another table where his bizarre movements continued for approximately four minutes (Ex. 4 at 1:01:50).

25. Austin again stood up and gave something to the detainee who had gotten out of his bunk previously (Ex. 4 at 1:05:13). Austin sat back down at a table and appeared incapable of sitting still (Ex. 4 at 1:06:05). His jerking and rocking behavior continued, and his distress was obviously increasing as he stood up and attempted to push something on the wall before returning to the table (Ex. 4 at 1:08:27).

26. After a fellow detainee witnessed Austin's deteriorating condition, he appeared to assist Austin in going to the shower area where Austin can been seen flailing around the entire six minutes he is in that area (Ex. 4 at 1:19:25). Approximately six minutes after entering the shower area Austin exited and stumbled toward his bunk before eventually falling to the ground (Ex. 4 at 1:25:30).

27. Video shows Austin slumped over the sink before he is once again escorted to the shower area by the helpful detainee (Ex. 4 at 1:27:31). Austin exited the shower area and stumbled to the table farthest from his bunk where his need for assistance continues to be apparent as he sits on the table top and rocks back and forth and side to side. Austin then fell off the table onto the floor as the overhead lights in County Dorm 4 were illuminated (Ex. 4 at 1:29:23).

28. After observing Austin's deteriorating condition, Detainee Charles Bozeman pushed the emergency call button to notify jail staffers that Austin was in need of assistance.

29. Defendant Ludgood responded first to County Dorm 4 in response to the emergency call button being pushed.

30. Defendant Ludgood appeared at the door of Dorm 4 (Ex. 4 at 1:31:06) and finally entered the dorm a minute later (Ex. 4 at 1:32:10). Defendant Ludgood stood beside Austin and then sat on the stool next to Austin as Austin rocked, jerked, and bounced nonstop.

31. Defendant Bobo entered the dorm and observed a then-standing Austin agitated and unable to successfully collect his bedding from his bunk. Defendant Ludgood and fellow detainees also witnessed this behavior. (Ex. 4 at 1:34:08).

32. Rather than call for emergency services or alert a supervisor, Defendant Ludgood pointed to the wall where Austin, still unable to remain still, placed his hands and was cuffed and escorted forcibly out of the dorm by Defendant Bobo. (Ex. 4 at 1:35:14).

33. Defendant Ludgood and Defendant Bobo escorted Austin from County Dorm 4 to Special Care Unit ("SCU") Cell Number 303. Austin was left on the floor alone with no other detainees or officers present. Like County Dorm 4, the Special Care Unit Cell is a KNRCF housing unit with video surveillance monitored by officers in the Central Control room.

34. During the process of Defendants Ludgood and Bobo escorting Austin from County Dorm 4 to Cell 303 via County Hall 02 and County Hall 04, Austin stumbled to the floor. Austin was physically assaulted by Defendant Ludgood once he was placed in the cell.

35. Austin was left alone in the SCU cell for over 30 minutes. During that period, he continued to demonstrate bizarre behavior that clearly revealed his serious physical distress. Austin's behavior was captured on KNRCF's video surveillance system and observed by KNRCF personnel, and the video recording of Austin's time in SCU is attached hereto as Exhibit 5.

36. Despite observing his clear distress and need for medical attention, the defendants did nothing.

37. While in Cell 303, Austin rolled onto his side and struggled to stand up (Ex. 5 at 00:01).

38. Austin moved around SCU 303 erratically as his condition continued to deteriorate. Once he was finally on his feet, he stumbled around the cell until he backed against a wall and slid down to the floor to a seated position where he momentarily became still before again rolling onto his side and struggling to get to his feet (Ex. 5 at 1:20).

39. Once on his feet, he staggered around the cell before he squatted near the bed and wall, briefly grabbed his throat, and fell backward into a seated position. He rocked back and forth and struggled to not lie on his back before standing up and slumping over the top bunk while his feet were on the bottom bunk (Ex. 5 at 2:52).

40. Austin then fell backward into a metal seat where he sat as his erratic movements became more intermittent; interrupted only by brief periods of no movement at all (Ex. 5 at 4:52).

41. Austin stood up from the metal seat and staggered to the end of the metal bunk beds where he unsteadily stood with his arms and head resting on the top bunk while crossing and uncrossing his feet for nearly 2 minutes (Ex. 5 at 8:00). He then let go of the bed and swayed forward and backward before falling to his knees and then to his back (Ex. 5 at 9:54).

42. Austin's erratic movements became even less frequent; interrupted by even longer periods of no movement (Ex. 5 at 10:50) until he had a burst of energy that allowed him to nearly sit up before he fell again to the floor onto his back (Ex. 5 at 11:24).

43. Austin continued to roll around on the floor until he was able to stand up and return to the bunk beds near the wall where he again squatted down for a few seconds. He then appeared to try to communicate with someone or something in the cell before propping himself up on a metal shelf attached to the metal seat. (Ex. 5 at 13:08).

44. After leaning on the shelf for approximately 20 seconds, Austin fell again to the floor. He rolled over onto his side and managed to position himself under the metal stool before rolling onto his back, then onto his side, then nearly climbing onto the bottom bunk before

returning to the floor. For approximately three minutes, Austin rolled around on the floor and attempted to get off the floor by using the bunk bed. (Ex. 5 at 13:59).

45. Eventually, Austin was able to stand for the last time (Ex. 5 at 16:51). He stood with his back against the wall for approximately 30 seconds until he fell against the metal stool (Ex. 5 at 17:21) where he remained propped until his final attempt to stand was unsuccessful (Ex. 5 at 19:03).

46. Austin then rolled around on the floor for approximately three minutes before stopping face-down on the floor with his head near the toilet (Ex. 5 at 21:52).

47. For the next four minutes and 38 seconds, Austin occasionally moved his legs and occasionally rocked slightly from left to right (Ex. 5 at 21:52)

48. Austin Parker's final movement was then captured by the KNRCF's Video Surveillance System (Ex. 5 at 25:30).

49. Defendant Ludgood and Defendant Bobo entered SCU 303 to check on Austin after nearly eight minutes had elapsed since Austin's final movement (Ex. 5 at 33:28).

50. At the time of Austin's detention at KNRCF, Defendant Bobo, Defendant Needom, Defendant Ludgood, and Defendant Dunbar had the ability to monitor Austin from the central control room. Video surveillance clearly revealed that Austin's medical condition was rapidly deteriorating.

51. Defendant Ludgood observed the physical contortions and bizarre behavior that made Austin's need for medical attention obvious. Despite being aware of Austin's distress and need for care from a health care provider, Defendant Ludgood failed to administer aid or call the jail nurse, a doctor, an ambulance, or any other health care provider.

52. Defendant Bobo observed the physical contortions and bizarre behavior that made Austin's need for medical attention obvious. Despite being aware of Austin's distress and need

for care from a health care provider, Defendant Bobo failed to administer aid or call the jail nurse, a doctor, an ambulance, or any other health care provider.

53.     Defendant Needom observed the physical contortions and bizarre behavior that made Austin's need for medical attention obvious.  Despite being aware of Austin's distress and need for care from a health care provider, Defendant Needom failed to administer aid or call the jail nurse, a doctor, an ambulance, or any other health care provider.

54.     Defendant Dunbar observed the physical contortions and bizarre behavior that made Austin's need for medical attention obvious.  Despite being aware of Austin's distress and need for care from a health care provider, Defendant Dunbar failed to administer aid or call the jail nurse, a doctor, an ambulance, or any other health care provider.

55.     At no time was there any attempt to resuscitate Austin by anyone employed at KNRCF.

56.     At no time was there any attempt to transport Austin to Stennis Hospital located approximately 2,000 feet from KNRCF. Medical personnel at Stennis had been specifically trained to remedy methamphetamine overdose:



57. Emergency Medical Service (EMS) was not called until after Defendants Ludgood and Bobo found Austin motionless in Cell 303. EMS workers attempted to revive Austin, but it was too late. Austin was pronounced dead by EMS personnel.

58. Defendant Needom eventually contacted her supervisor, Defendant Hill, who arrived on at KNRCF nearly two hours after Austin was found dead in Cell 303.

59. At some point after Austin was found motionless, Defendant Bobo called Sheriff Moore, Warden Collins, and Captain Hill.

60. At the time of Austin's death, Kemper County had a policy, practice, or custom of failing to contact health care professionals despite being on notice that inmates and detainees at KNRCF were in need of medical attention.

61. Prior to Austin's death at KNRCF, Kemper County failed to adequately train and supervise employees of KNRCF, including the defendants in this action, regarding identification of medical distress, including drug overdoses, and the appropriate response thereto, including the need for immediate medical care. Defendants Moore, Collins, and Hill were in supervisory roles over the other Defendants herein, and had the duty and responsibility to train and supervise their subordinates. They failed to train and supervise their subordinates to properly respond to medical emergencies.

62. Defendants' unconstitutional, unlawful, and inhumane acts caused Austin's death. Had health care providers been contacted in a timely manner, the effects of the methamphetamine Austin consumed could have been reversed, and Austin would have survived.

CAUSES OF ACTION

### COUNT I
*Monell* Claims Under 42 U.S.C. § 1983

63. Plaintiff Denise Parker hereby repeats and realleges every allegation of this Complaint.

12

64. At all times relevant to this count the Defendants acted under the color of law.

65. Count I is alleged against Defendants Kemper County, Moore, Collins, Hill, and John and Jane Does 1-25, each of whom bore policymaking responsibility at the KNRCF. They are known collectively hereinafter as "*Monell* Defendants."

66. At the time of Austin's death, the *Monell* Defendants had a policy, practice, or custom of failing to contact health care professionals despite being on notice that inmates and detainees at KNRCF needed medical attention. Austin Parker died because of this policy, practice, or custom.

67. Further, the *Monell* Defendants (1) failed to train or supervise the officers involved; (2) there is a causal connection between the failure to supervise or train and the violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights.

68. The *Monell* Defendants had a policy, practice, custom, or usage of failing to provide adequate training to its jail staff in the recognition and proper handling of serious medical conditions of arrestees, detainees, and inmates at the KNRCF. Likewise, the *Monell* Defendants had a policy, practice, custom, or usage of failing to supervise jail staff in the recognition and proper handling of serious medical conditions of arrestees, detainees, and inmates at the KNRCF.

69. The above-described widespread practices, which were so well settled as to constitute the policies of the *Monell* Defendants, were allowed to exist because policymakers with authority over KNRCF, jail staff, and the people housed at KNRCF exhibited deliberate indifference to the problems arising therefrom, thereby effectively ratifying the policies and failing to protect those housed at KNRCF as required by law. The polices, practices, and customs set forth above were the driving force behind the numerous constitutional violations in this case that directly and proximately caused Plaintiff to suffer the injuries and damages set forth herein.

## COUNT II
### Failure to Render Medical Care to a Detainee –
### Violation of the Fourteenth Amendment Under 42 U.S.C. § 1983

70. Plaintiff Denise Parker hereby repeats and realleges every allegation of this Complaint. Count II is alleged as to all Defendants.

71. At all times relevant to this Complaint, Defendants acted under the color of law.

72. At all times relevant to this Complaint, Austin was a pretrial detainee at the Kemper-Neshoba Regional Correctional Facility. Due to his status as a detainee, Austin was wholly dependent upon the Defendants for access to emergency medical care.

73. Under settled United States Supreme Court authority, and in accordance with the Fourteenth Amendment, Austin was entitled to be free from a known and unreasonable risk of serious harm while in the custody of the Kemper-Neshoba Regional Correctional Facility.

74. The Defendants' actions and omissions were undertaken with malice and/or reckless disregard for Austin's constitutional rights, and the individual Defendants acted with deliberate indifference towards Austin's health and safety.

75. The Defendants at the KNRCF were subjectively aware of Austin's rapidly escalating medical distress. Further, they were aware of the substantial risk of harm to Austin if he did not receive medical attention. Despite this, the Defendants uniformly failed to contact an outside emergency medical provider or render emergency medical aid to Austin.

76. The Defendants' unconstitutional conduct caused Austin's preventable pain, prolonged suffering, distress, and death.

77. The Defendants' actions an omissions were the direct and proximate cause of the violations of Austin's constitutional rights, of Mr. Parker's death, and of the damages suffered by him and his heirs.

78. The Defendants knew or should have known Mr. Parker's obvious medical distress warranted immediate medical attention, amounting to deliberate indifference.

79. As a result, Defendants are liable to the Plaintiff for violating Mr. Parker's rights secured to him under the Fourteenth Amendment to the United States Constitution.

## COUNT III
### Failure to Render Medical Aid to a Prisoner – Violation of the Eighth Amendment Under 42 U.S.C. § 1983

80. Plaintiff Denise Parker hereby repeats and realleges every allegation of this Complaint. Count III is alleged as to all Defendants.

81. In the alternative to Count II, if Austin was a convicted inmate rather than a pretrial detainee at the time of his death, his claims herein should be considered under the Eighth Amendment to the United States Constitution.

82. At all times relevant to this Complaint, Defendants acted under the color of law.

83. Under settled United States Supreme Court authority, and in accordance with the Eighth Amendment, Austin was entitled to adequate medical care and to be free from a known and unreasonable risk of serious harm, and cruel and unusual punishment, while in the custody of the Kemper-Neshoba Regional Correctional Facility.

84. Defendants were subjectively and objectively aware of a substantial risk of serious harm to Austin.

85. The Defendants were callous, cruel, and acted with deliberate indifference in not rendering medical aid to Austin despite his obvious medical distress. Defendants' deliberate indifference resulted in Austin's death.

86. The Defendants' actions and omissions were undertaken with malice and/or reckless disregard for Austin's constitutional rights, and the individual Defendants acted with deliberate indifference for Austin's rights.

87. As a result of the unconstitutional conduct of Defendants, Austin experienced preventable pain, suffering, emotional distress, injury, and ultimately, death.

88.   The Defendants' actions and omissions were the direct and proximate cause of the violations of Austin's constitutional rights, of his death, and of the damages suffered by him and his heirs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Denise Parker prays for relief, as follows:

89.   Award Plaintiff general damages according to the proof;

90.   Award Plaintiff punitive damages against the Defendants in amounts that are fair, just, and reasonable, to be determined at trial;

91.   Award Plaintiff reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

92.   Award Plaintiff costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

93.   Grant Plaintiff any such other and further relief as the Court may deem appropriate and just.

Dated February 25th, 2025.

                                         Respectfully submitted,

                                         s/ *Cliff Johnson*
                                         Denise Parker,
                                         By and through her counsel of record,
                                         Cliff Johnson (MSB #9383)
                                         MACARTHUR JUSTICE CENTER
                                         University of Mississippi School of Law
                                         481 Chucky Mullins Drive
                                         University, Mississippi 38677
                                         P: 662-915-6863
                                         cliff.johnson@macarthurjustice.org

OF COUNSEL:
J. Matthew Eichelberger (MSB No. 101060)
Madeline M. Iles (MSB No. 106186)
Eichelberger Law Firm, PLLC
1640 Lelia Dr, Ste 120
Jackson, MS 39216
Telephone: 601-292-7940
Email: matt@ike-law.com, madeline@ike-law.com